IDAHO HEALTH CARE ASSOCIATION, an Idaho corporation; Idaho Hospital Association, an Idaho corporation; Bingham Memorial Hospital; Sandpoint Manor, a corporation; Homedale Care Center, a corporation; Idaho Falls Good Samaritan Nursing Center, a corporation; Edna Poindexter, an individual; Ross Kessler, an individual; John A. Doe, John B. Doe, Jane A. Doe, and Jane B. Doe, Individuals, Plaintiffs,

v.

Louis W. SULLIVAN, M.D., Secretary, Department of Health and Human Services, United States of America; Richard Donovan, Director, Idaho Department of Health and Welfare, Defendants.

Civ. No. 88–1425.

United States District Court, D. Idaho.

May 11, 1989.

---

Donald W. Lojek, Bradley H. Hall and Joseph D. McCollum, Jr., Hawley, Troxell, Ennis & Hawley, Boise, Idaho, for plaintiffs.

Jim Jones, Atty. Gen., and Michael DeAngelo, Deputy Atty. Gen., Dept. of Health and Welfare, Boise, Idaho, for defendant Richard Donovan.

Celeste K. Miller, Asst. U.S. Atty., Boise, Idaho, and Susanne Lee, Office of General Counsel, Dept. of Health & Welfare, Washington, D.C., for defendant Bowen.

## MEMORANDUM DECISION

CALLISTER, District Judge.

The Court has before it plaintiffs' motion for preliminary injunction. The Court heard evidence and argument and is now prepared to submit its written findings. This memorandum decision shall constitute the Court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

## FINDINGS OF FACT

On December 28, 1988, plaintiff Idaho Health Care Association (IHCA), representing approximately 60 licensed long-term health care facilities in Idaho; and Idaho Hospital Association (IHA), representing licensed hospitals throughout Idaho, filed a complaint for a temporary restraining order, injunction, and declaratory relief. The named defendants were Secretary of the Department of Health and Human Services and the Director of the Idaho Department of Health and Welfare. The Court held a hearing and on December 30, 1988, granted plaintiffs a temporary restraining order which directed that persons be admitted to nursing homes without pre-screening so long as they are screened within fifteen days of admission. Then on January 5, 1989, the plaintiffs made a motion to amend the order to require the State to initiate the Level I prescreening. The Court denied the motion to amend. On March 16–17, 1989, the Court heard arguments on the motion for preliminary injunction. At the conclusion of the two-day hearing the Court ordered proposed findings of fact and conclusions of law and post-trial briefs to be submitted. Finally, on April 14, 1989, the Court heard additional arguments and took the preliminary injunction under advisement.[1]

In an attempt to improve the quality of care in nursing homes, Congress enacted Pre–Admission Screening and Annual Resident Review (PASARR) recommendations in the Omnibus Budget and Reconciliation Act of 1987 (OBRA), 42 U.S.C. § 1396r. PASARR requires that nursing facilities must not admit on or after January 1, 1989, any new resident who is mentally ill or mentally retarded unless the state has determined prior to admission that the nursing facility administers the level of services required by the individual. 42 U.S.C. § 1396r(b)(3)(F).

A prospective nursing home patient must pass two levels of screening before admission. The first is referred to as a Level I screening. This is an examination by a qualified physician in order to determine whether or not the patient has some form of mental retardation or mental illness. This Level I screening requires responses to six simple questions and can be completed immediately if the physician knows the patient. In the case of a patient who is not known by the physician, the Level I screening can be completed within fifteen minutes. Transcript of Hearing on Preliminary Injunction, March 16, 1989, pp. 24–25. If the patient "passes" the Level I screening, then no further examination is needed and the patient is allowed into the nursing facility. However, if the Level I screening determines a possibility of some form of mental illness or mental retardation, then the patient must go through a second examination, commonly referred to as a Level II screening. This screening is made up of a group of three individuals and completed

---

1. At the last hearing, plaintiffs requested a permanent injunction as well as declaratory relief. However, at this point in time, the Court is only concerned with the motion for preliminary injunction and will not address the issues of a permanent injunction or declaratory relief.

by the State Department of Health and Welfare.

In order to comply with the federal and state law, the nursing home administrator only has to check if the Level I screening form has been filled out before admitting the individual to the nursing facility. Transcript of Hearing on Preliminary Injunction, March 16, 1989, at 150. The purpose for pre-screening is that if a patient is inappropriately placed in a facility then the nursing home is not reimbursed under Medicaid for the time the patient is inappropriately in the nursing home. Transcript of Hearing on Preliminary Injunction, March 16, 1989, at 178.

The federal law also provided that the Secretary of the Department of Health and Human Services "shall develop by not later than October 1, 1988, minimum criteria for states to use in making determinations [for pre-admission screening]...." 42 U.S.C. § 1396r(f)(8). In September of 1988, Health Care Financing Administration (HCFA), the group at the federal level responsible for administration of the Medicaid program, developed and circulated draft criteria entitled "Minimum Federal Criteria for States to Use in Making Preadmission and Annual Review Determinations About Admission to Continued Residence in Nursing Facilities for Individuals Who Have Mental Illness or Mental Retardation." Exhibit B attached to Complaint. These criteria were to provide guidance to the states but were not binding upon them until after their publication in the *Federal Register*. *Id.* (Emphasis in original.)

OBRA required states to develop their own laws in order to carry out the PA-SARR requirements; Furthermore, 42 U.S.C. § 1396r(e)(1) also provided that "The failure of the Secretary to establish requirements under subsection (f)(2) *shall not* relieve any state of its responsibility under this paragraph." (Emphasis added.) On December 23, 1988, the state defendant sent to Medicaid providers the above-mentioned criteria for their use in making the pre-admission review. Exhibit D attached to Plaintiffs' Complaint. These criteria were to assist Medicaid providers in the

implementation of OBRA's requirements. On January 6, 1989, the Idaho Department of Health and Welfare, by emergency procedures and regular rulemaking, adopted rules and regulations pursuant to the Idaho Administrative Procedures Act, Idaho Code § 67–5201 *et seq.* These regulations were to take effect on January 13, 1989. The Department of Health and Welfare published notice of the hearings concerning the emergency rules and regulations and requested that plaintiffs submit written comments. Defendants' Exhibit 11. The Idaho Health Care Association and the Idaho Hospital Association, on behalf of its members, did submit comments. Finally, on January 27, 1989, the State transmitted to Idaho nursing home providers the advice, instructions and forms to assist them in monitoring the new requirements. Affidavit of David De Angelis filed March 13, 1989, pp. 3–4.

At the federal level, on February 2, 1989, HCFA published a Final Rule with a comment period establishing the Medicaid and Medicare requirements for nursing facilities. 54 F.R. 5316 (Feb. 2, 1989). HCFA is now revising the draft criteria due to the numerous comments from inside and outside the Department.

In support of the request for preliminary injunction, the plaintiffs rely upon four primary issues. First, the federal government has failed to promulgate regulations in accordance with the Administrative Procedures Act (APA); second, the state defendant has failed to follow the Idaho Administrative Procedures Act (IAPA); third, state and federal agencies are unlawfully attempting to impose the regulations retroactively to January 1, 1989; and fourth, the statute violates private paying patients' due process rights, right to contract, and right of association. The Court will address each of these allegations in turn.

Plaintiffs' first contention is that the federal government has failed to promulgate regulations in accordance with the APA and thus there has been great confusion over the interpretation and application of the new law. At the hearing the testimony indicated that there was some confusion

regarding the PASARR requirements up until the beginning of January 1989. However, that confusion appears to have resolved itself over the past few months. Transcript of Hearing on Preliminary Injunction, March 16, 1989, at 164. The state defendant has and is currently in the process of providing additional training and explanations of the requirements and the Department of Health and Welfare has promulgated rules and regulations governing the same. Pre-admission screening has already been completed and successfully implemented in three health care facilities operated by the Western Health Care Corporation. Transcript of Hearing on Preliminary Injunction, March 16, 1989, at 111.

Plaintiffs maintain that part of their confusion is due to the lack of definition of a number of terms used throughout the requirements. Specifically, the terms creating most problems are "mentally ill," "mentally retarded," "active treatment," and "advanced years." The terms "mentally ill" and "mentally retarded" are clear and well defined. Mental illness is defined in the *Diagnostic and Statistical Manual of Mental Disorders* (3rd ed.), a publication which is widely used throughout the medical community. Affidavit of David De Angelis, filed March 13, 1989, at 3; Transcript of Hearing on Preliminary Injunction, March 16, 1989, at 142, 143. The term "mentally retarded" involves determinations which may be performed by reliance upon the *Standards and Classification in Mental Retardation* (1983 ed.) issued by the American Association of Mental Retardation. *Id.* Both of these publications provide comprehensive and specific details to enable a provider to identify persons who are affected by either of these conditions.

As for the term "advanced years" there is no requirement that the providers determine whether or not a person is of "advanced years." But this determination is made by the State as part of the Level II screening process. Additionally, the testimony indicated that a definition of this phrase is subjective as applied to each individual patient based upon the professional judgment of the examiner.

In January of 1989 the state defendant performed a monitoring and evaluation study in order to determine pre-admission data. This study indicated that out of the sixty-nine admissions, only eleven individuals went to the Level II screening, and of the eleven, all were approved for nursing home care. Transcript of Hearing on Preliminary Injunction, March 16, 1989, at 158, 159.

With respect to enforcement options available to the state and federal defendants, the state defendant has yet to implement, or attempt to enforce, these provisions and does not intend to do so until such time as the federal defendant has published final regulations that become binding upon the states. Before imposing penalties, the state would conduct a survey of the nursing facilities, notify the facility of any deficiencies, and work with the facility to design and implement a plan of correction. Transcript of Hearing on Preliminary Injunction, March 16, 1989, at 160–163. Likewise, the federal defendant will not conduct "look behind" surveys with regard to the state current screening process and will undertake no forms of penalty until binding rules are in effect. Transcript of Hearing on Preliminary Injunction, March 16, 1989, at 201, 202, 207. Furthermore, these upcoming regulations will apply prospectively, not retrospectively. *Id.* at 201. Even assuming a decision was made to decertify a facility, the provider is entitled to continued Medicaid payments pending an evidentiary hearing and a decision by an administrative law judge.

Notwithstanding the pre-admission screening, the attending physician is currently required to determine prior to admission whether the placement from either a hospital or a patient's home to a nursing facility is appropriate. Additionally, hospitals typically begin discharge planning as soon as the patient is admitted. Transcript of Hearing on Preliminary Injunction, March 16, 1989, at 96–97. With regard to patients seeking admission to a nursing facility from their homes, in-home personal care services or other types of institutional services are available if the pre-admission screening cannot be completed prior to the

proposed admission date. The Court recognizes that in the majority of cases where a patient is required to stay in the hospital awaiting completion of the Level II screening, Medicare and Medicaid will pick up those costs. However, private pay patients may have to take other actions.[2] If it is determined that a nursing facility level of care is not appropriate for an individual patient, then other alternative placements such as residential care, foster care, shelter care, intermediate care facilities or institutions are the alternative placements. Transcript of Hearing on Preliminary Injunction, March 16, 1989, at 171.

Under the Medicare system of reimbursement, a hospital is reimbursed a set amount pursuant to a "Diagnosis Related Group" (DRG). A hospital receives a set amount per patient discharge based on the DRG even if the patient's length of stay is much less than the mean length of stay for that particular DRG. This system is based on national averages for hospital costs that include an initial basic calculated payment for days patients remain in the hospital because a nursing home bed is not available. In addition to the amounts already included in the basic DRG calculations, the Medicare statute and regulations provide for "additional payments when the patient's length of stay exceeds the mean length of stay for the applicable DRG." These additional payments are known as "outlier payments." Transcript of Hearing on Preliminary Injunction, March 16, 1989, at 209–214.

## CONCLUSIONS OF LAW

The granting of a preliminary injunction is extraordinary relief. *Shelton v. National Collegiate Athletic Ass'n*, 539 F.2d 1197, 1199 (9th Cir.1976); *GTE Corp. v. Williams*, 731 F.2d 676, 678 (10th Cir.1984); *United States v. Lambert*, 695 F.2d 536, 539 (11th Cir.1983).

The standard for obtaining a preliminary injunction in the Ninth Circuit was set forth in *United States v. Odessa Union Warehouse Co-op.*, 833 F.2d 172 (9th Cir. 1987). There, the Court found that the traditional factors considered in determining whether or not to grant a preliminary injunction are: (1) the likelihood of plaintiff's success on the merits; (2) the possibility of plaintiff suffering irreparable injury if the relief is not granted; (3) the extent to which the balance of hardships favor the respective parties; and (4) in certain cases whether the public interest will be advanced by the provision of preliminary relief. *Id.* at 174.

In order to obtain a preliminary injunction, the moving party must show either (1) a combination of probable success on the merits and the possibility of irreparable injury; or (2) that serious questions are raised and the balance of hardships tips sharply in the moving party's favor. *Chalk v. United States Dist. Court, Cent. Dist. of California*, 840 F.2d 701, 704 (9th Cir.1988); *Odessa Union Warehouse Co-op*, 833 F.2d at 174. These two tests are not separate but they are the outer reaches of a single continuum. *City of Tenakee Springs v. Block*, 778 F.2d 1402, 1407 (9th Cir.1985). Under either of these tests, the plaintiffs have failed to demonstrate their right to a preliminary injunction. In the present case, the possibility of irreparable injury would most likely arise if the Court granted a preliminary injunction since nursing homes could go back to the old system and "warehouse" mentally ill or mentally retarded individuals in facilities which were not equipped to provide the best treatment for that individual patient.[3] On the other hand, if the Court denied the preliminary injunction, there is *some* possibility that private paying patients may have some additional financial burdens. Although a concern, the Court does not believe that such rises to the level of irreparable injury. Furthermore, a comparison of the two

---

**2.** The court does not totally agree with the effect the law will have on private-paying patients. However, that difference of opinion does not allow it to change the laws as set forth by Congress.

**3.** Even though Idaho has not had the degree of problems associated with inappropriate placement, as have other states, it still remains a concern.

hardships tips sharply in favor of the nursing home patients. Next, there is no doubt the public interest is advanced through the enactment of the PASARR requirements and thus any altering thereof would impede that interest. Finally, as demonstrated below, plaintiffs have little if any chance of success on the merits.

To grant plaintiffs injunctive relief would delay the implementation of the pre-admission screening program clearly required by statute. After reviewing the entire record, the Court has not been persuaded to take such a step.

■ In reviewing the possibility of plaintiffs' success on the merits, we must go back to the original allegations, the first of which was that the federal government has violated the APA and that the Secretary was required to publish the draft criteria as rules pursuant to the rule making requirements of 5 U.S.C. § 553. First of all, the law required the federal defendant to develop "criteria" by October 1, 1988, and not rules or regulations. 42 U.S.C. § 1396r(f)(8). While § 553 of the APA requires formal rule making proceedings prior to the promulgation of substantive rules, the APA exempts from its publication "interpretive rules, general statements of policy, or rules of agency organization, procedure or practice...." 5 U.S.C. § 553(b)(3)(A). Here the federal government has admitted that it will not enforce the penalty provisions until binding rules and regulations are in effect. In determining whether rules are interpretive versus substantive, the Second Circuit believes that it is not the label the particular agency places upon its administrative power, rather it is what the agency does in fact that is controlling. *Lewis–Mota v. Secretary of Labor*, 469 F.2d 478, 481–82 (2nd Cir.1972). Here the federal government is not advocating that the implementing instructions and criteria are currently binding but rather it admits that at this time it has no binding rules and regulations in effect.

Furthermore, the statute contains no language requiring regulations on this matter. The precise word used in both 42 U.S.C. § 1396r(e)(7)(A) and 42 U.S.C. § 1396r(f)(8) is "criteria" and not regulation. Plaintiffs maintain on the other hand that defendants are merely nitpicking and that criteria is the equivalent of regulations. This theory is rebutted by the fact that 42 U.S.C. § 1396r(f)(7) directs the Secretary to "issue regulations." After considering this the Court finds that Congress did intend this distinction partially because they wanted the states to take the new law and fit it to their individual needs based upon their individual resources. One must remember that the Government is not attempting to bypass the requirements of the APA but actually intends on complying and following the Act's requirements. The federal government has published regulations for comments and is at the present time redrafting the regulations based upon those comments.

The plaintiffs have cited the Court to a number of cases that appear to be on point. However, after further review the Court is of the opinion that each of those cases are distinguishable from the case at bar.

The plaintiffs' second allegation, much like the first, is that the state defendant has failed to follow the Idaho Administrative Procedures Act (IAPA), Idaho Code § 67–5201 *et seq.* Although plaintiffs make this bare allegation, they fail to point the Court to any objective evidence so indicating. As mentioned earlier, on January 6, 1989, the state adopted rules and regulations by emergency procedures. These regulations became effective January 13, 1989, and are scheduled to expire at the end of 120 days, on May 13, 1989. Idaho Code § 67–5203(b) provides:

If an agency finds that an imminent peril to the public health, safety, or welfare requires adoption of a rule upon fewer days' notice than required by subsection (a) of this section, and states in writing its reasons for that finding, or if a change in law requires a rule to be in place at the same time as the law goes into effect, it may proceed without prior notice or hearing or upon any abbreviated notice and hearing that it finds practicable, to adopt an emergency rule. The rule may be effective for a period of not

longer than one hundred twenty (120) days unless during that time the agency provides for regular promulgation, notice, and hearings as required by subsections (a) and (c) of this section....

■ The Idaho Department of Health and Welfare clearly complied with the emergency rule-making provisions in accordance with IAPA, and therefore this Court will not rely upon the bare allegation of plaintiffs to the contrary. Defendants' Exhibit 11.

■ As part of the first two allegations, plaintiffs aver that there are numerous terms in the law which are ill-defined and therefore cause confusion among the community. Once again the plaintiffs allegation is unsupported by the evidence. The evidence clearly indicated that the term "mentally ill" is defined in the *Diagnostic and Statistical Manual of Mental Disorders* (3rd ed.), a widely-known publication throughout the medical community. In addition, the term "mentally retarded" is comprehensively defined in the *Standards and Classification in Mental Retardation* (1983 ed.), which is issued by the American Association of Mental Retardation. Both of these terms, when used in the hospital and nursing home communities are adequately understood. Plaintiffs also felt ill-informed as to the definitions of "advanced years" and "active treatment." At the hearing the testimony reiterated that although "advanced years" is somewhat subjective, it needs to be as it is applied to each individual patient. Finally, as to the phrase "active treatment," the Court finds that such is a common term throughout the industry; and not so ambiguous as to prevent it from being effectively applied.

■ In its previous discussion, the Court found that the federal government had not violated the APA. However, even assuming that the federal government should have promulgated the regulations, its failure to do so does not render the law invalid. 42 U.S.C. § 1396r(e)(7)(A) states: "The failure of the Secretary to develop minimum criteria under subsection (f)(8) shall not relieve any State of its responsibility to have a pre-admission screening program

under this subparagraph or to perform resident reviews under subparagraph (B)." Thus, the United States Congress has required the states participating in the Medicaid program to implement the pre-screening requirements *regardless of whether the federal regulations are promulgated.*

Moreover, the state has complied with the Idaho Administrative Procedures Act in its application of the Emergency Rules and Regulations effective January 13, 1989.

■ Plaintiffs third major contention is that both the state and federal agencies are attempting to impose regulations retroactive to January 1, 1989, and that such imposition is strictly prohibited. Theoretically, plaintiffs are correct in their assertion. However, practical application of that rule of law is of no consequence here. It is uncontroverted that as of January 13, 1989, the State of Idaho adopted emergency rules and regulations pertaining to the pre-screening process. Plaintiffs would have an argument that the retroactivity prohibition would apply from the January 13, 1989, enactment of the rules back until January 1, 1989, the date the law went into effect. However, the evidence shows that as of today, neither the federal nor the state agencies have penalized any nursing home for any prior wrongdoings. Additionally, the federal defendant informed the Court that it had no intentions of imposing any penalties for prior wrongdoings committed before its enactment of binding rules and regulations. The Court finds that the retroactivity argument is without merit and that it is clear that the effect of the State's rules and regulations have been prospective since January 13, 1989. Any argument that the law had retroactive effect from January 13th back to January 1st is of no consequence since no action enforcing such policies was taken.

■ The last of plaintiffs' theories centers around the allegation that the statute violates a private paying patient's due process rights to be free from arbitrary governmental power; and impairs the right to contract, first amendment right of asso-

ciation, and existing contract rights. The Court disagrees. Despite the financial benefits available to a participant in Medicaid, the nursing homes' decision to come under the system is nonetheless voluntary. *Minnesota Assoc. of Health Care Facilities v. Minnesota Dept. of Pub. Welfare*, 742 F.2d 442, 446 (8th Cir.1984) *cert. denied* 469 U.S. 1215, 105 S.Ct. 1191, 84 L.Ed.2d 337 (1985). Voluntary participation in the Medicaid system carries with it certain restrictions. As the United States Supreme Court found in *Nebbia v. New York*, 291 U.S. 502, 527–28, 54 S.Ct. 505, 511–12, 78 L.Ed. 940 (1934): "The Constitution does not guarantee the unrestricted privilege to engage in a business or to conduct it as one pleases.... [T]he right to conduct a business, or to pursue a calling, may be conditioned." *Id.* at 527, 528, 54 S.Ct. at 511, 512. Thus, this voluntary participation forces the plaintiffs to accept imposition of governmental regulation.[4] In partial support of their constitutional attack on the pre-screening process, plaintiffs allege that the law violates private paying patients' due process rights. The Court finds that the law has a reasonable relation to a proper legislative purpose. Its enactment was for the benefit of many individuals who are unable to look out for themselves in that they were being inappropriately placed in nursing homes where they were not receiving active treatment for their individual needs. Thus, a form of "warehousing" was occurring. *See West Coast Hotel Co. v. Parrish*, 300 U.S. 379, 391–92, 57 S.Ct. 578, 581–82, 81 L.Ed. 703 (1937). In *West Coast Hotel Co.* the Court found what this Court feels needs to be reiterated here:

> What is this freedom? The Constitution does not speak of freedom of contract. It speaks of liberty and prohibits the deprivation of liberty without due process of law. In prohibiting that deprivation, the Constitution does not recognize an absolute and uncontrollable liberty. Liberty in each of its phases has its history and connotation. But the liberty safeguarded is liberty in a social organization which requires the protection of law against the evils which menace the health, safety, morals and welfare of the people.

> [I]t was recognized in the cases cited, as in many others, that freedom of contract is a qualified and not an absolute right. There is no absolute freedom to do as one wills or to contract as one chooses. The guaranty of liberty does not withdraw from legislative supervision that wide department of activity which consists of the making of contracts, or deny to government the power to provide restrictive safeguards. Liberty implies the absence of arbitrary restraint, not immunity from reasonable regulations and prohibitions imposed in the interests of the community. (Citations omitted.)

*West Coast Hotel Co. v. Parrish*, 300 U.S. at 391, 392, 57 S.Ct. at 581, 582.

In sum this Court, after looking at the merits, does not believe plaintiffs have a good enough chance of success on the merits in order to justify a preliminary injunction.

Plaintiffs also asserted a theory of impairment of the freedom of association with existing contract rights. As for the freedom of association theory, the plaintiffs have failed to pursue this theory in their briefing or oral argument. Moreover, the Court was unable to find any case law in support thereof.

■ Lastly, plaintiffs propounded that the new law impaired existing contract rights. The Court is of the opinion that the previous discussion pertaining to the nursing homes' voluntary participation in the Medicaid program adequately disposes of this issue. However, it will briefly adress it. As to this issue, the threshold question is "whether the state law has, in fact, operated as a substantial impairment of a contractual relationship." *Energy Reserves*

---

**4.** Plaintiffs argue that due to the large percentage of Medicaid patients that such renders the participation involuntary. This theory was strictly refused in *Whitney v. Heckler,* 780 F.2d 963, 972, n. 12 (11th Cir.1986) *cert. denied, Whitney v. Bowen,* 479 U.S. 813, 107 S.Ct. 65, 93 L.Ed.2d 23 (1986).

*Group, Inc. v. Kansas Power & Light Co.,* 459 U.S. 400, 411, 103 S.Ct. 697, 704, 74 L.Ed.2d 569 (1983). The Court has asked itself what contract rights are being impaired? The answer appears to be that improperly placed patients are giving up the "so-called right" to be warehoused in nursing homes whereby they receive no active treatment. The proper response to this "so-called right" must be "thanks, but no thanks."

The Court is convinced that the present law is necessary for the general good of the public, and in particular for the benefit of the mentally retarded and mentally ill people who at many times are unable to speak out for themselves. *cf. Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 241, 98 S.Ct. 2716, 2720, 57 L.Ed.2d 727 (1978). In short, plaintiffs, after exhaustive hearings and briefings, have failed to persuade the Court that a preliminary injunction should be granted under the present circumstances.

ORDER

The Court has examined the entire record concerning the motion for preliminary injunction filed by the plaintiffs. In accordance with the views expressed in the memorandum decision accompanying this order,

NOW, THEREFORE, IT IS HEREBY ORDERED that plaintiffs' motion for preliminary injunction be, and the same is hereby, DENIED.

IT IS FURTHER ORDERED that the temporary restraining order entered by the Court on December 31, 1988, be, and the same is hereby, LIFTED as of May 31, 1989.

IT IS FURTHER ORDERED that each party shall bear their own costs.