**Robert A. RAYFORD, et al.**

v.

**Otis R. BOWEN, Secretary of Health and Human Services, et al.**

**Civ. A. No. 89–0148.**

United States District Court,
W.D. Louisiana,
Alexandria Division.

May 25, 1989.

---

G. Earl Humphries III, Humphries & Humphries, Alexandria, La., for Robert A. Rayford, Alexandria Nursing Center Inc., Louisiana Nursing Home Ass'n, John A. Doe, Jane A. Doe.

April Snellgrove, Asst. Atty. Gen., Susan Stafford, Staff Atty., Louisiana Dept. of Justice, Div. of Risk Litigation, Bruce Waters, Staff Atty., Dept. of Health and Hospitals, Baton Rouge, La., for David L. Ramsey and Secretary of HHS.

Joseph S. Cage, Jr., U.S. Atty., John R. Halliburton, Asst. U.S. Atty., Shreveport, La., and Susanne M. Lee, Office of Gen. Counsel, Dept. of Health & Human Services, Health Care Financing Admin., Washington, D.C., for U.S.

Brook, Morial, Cassibry, Fraiche & Pizza, Danielle Lombardo Trostorff, Normand F. Pizza, New Orleans, La., for Louisiana Hosp., Richland Parish Hosp. Service Dist. No. 1, d/b/a Richland Parish Hospital–Rayville and Richland Parish Hosp. Service Dist. No. 1, d/b/a Richland Parish Hospital–Delhi.

## RULING

LITTLE, District Judge.

### I. BACKGROUND

This suit challenges the implementation of an amendment to Title XIX of the Social Security Act, the Medicaid statute (42 U.S.C. § 1396 *et seq.*), on a variety of constitutional and statutory grounds. The statutes allegedly violated are the Administrative Procedure Act (5 U.S.C. § 551 *et seq.*) and the Louisiana Administrative Procedure Act (La. R.S. § 49:950 *et seq.*) whereas the constitutional provisions supposedly offended are liberty of contract and the contract clause. The plaintiffs are Robert A. Rayford, the owner of several nursing homes; the Louisiana Nursing Home Association; the Alexandria Nursing Center, Inc.; Lottie Sharp, a nursing home resident who is eligible for Medicaid; Howard Walker, a mentally ill nursing home resident who is not eligible for Medicaid; Alma McBride, a mentally ill nursing home resident who is not eligible for Medicaid; and a class of potential nursing home residents whose members do not qualify for Medicaid. The defendants are Otis R. Bowen, the former head of the Department of Health and Human Services (HHS), and David L. Ramsey, the Secretary of Health and Hospitals of the State of Louisiana.

The statutory scheme under attack is complex. The Omnibus Budget Reconciliation Act of 1987, Pub.L. No. 100–203, 101 Stat. 1330 (1987) (OBRA) amended the Medicaid statute in order to prevent the inappropriate placement of the mentally ill and of the mentally retarded in nursing homes. It forbids nursing homes receiving Medicaid payments from admitting after 1 January 1989 the mentally ill and retarded unless the state administering the federal program determines prior to admission that the individual ought to be placed in a nursing home. 42 U.S.C. § 1396r(b)(3)(F). It

also requires the several states to review each resident of a nursing home who is mentally ill or retarded by 1 April 1990 to determine whether he may stay. 42 U.S.C. § 1396r(e)(7)(B). The statute authorizes the Secretary of Health and Human Services to implement the program. 42 U.S.C. § 1396r(f)(8)(A) states that the "Secretary shall develop, by not later than October 1, 1988, minimum criteria for States to use in making determinations under subsections (b)(3)(F) and (e)(7)(B)." The states, however, must have a program in place to conduct preadmission screening by 1 January 1989 regardless of whether any criteria are established by the Secretary. 42 U.S.C. § 1396r(e)(7)(A). The statute does not state which rules the states must follow if the Secretary fails to develop criteria.

The statute puts teeth behind its requirements. 42 U.S.C. § 1396i(b) authorizes the Secretary to terminate a contract with a deficient facility. 42 U.S.C. § 1396i(b)(2). The Secretary may also levy civil money penalties and appoint temporary management. 42 U.S.C. § 1396r(h)(3). Last but not least, it forbids payment for "nursing facility services furnished to an individual for whom a [preadmission screening] determination has not been made." 42 U.S.C. § 1396r(e)(7)(D).

The Secretary of HHS failed to publish any criteria, Louisiana implemented OBRA, and this lawsuit ensued. The gravamen of the plaintiffs' complaint is that they cannot comply with the law because they have no idea what it is. They seek a preliminary injunction to block OBRA until the rules are finally published. The defendants contend that there is no requirement that the rules be published before the legislation is implemented. OBRA merely mandates that criteria be developed by 1 October 1988 and HHS has complied with this requirement. The defendants argue that the unpublished criteria are clear and, therefore, the plaintiffs can readily comply with them to avoid any hardship.

HHS developed five different sets of criteria. *See* Plaintiffs' Exhibit 5 and testimony of Bock. The branch of the Department of Health and Human Services entrusted with running the program mandated by 42 U.S.C. § 1396r(f)(8)(A) is the Health Care Financing Administration (HCFA). HFCA sought input from a variety of individuals and groups in developing the draft criteria. *See* Affidavit of Thomas Hoyer. Based on these discussions, HFCA developed proposed criteria and changed them four times prior to trial. The fifth and latest version of the draft criteria spells out a two-step application process for all nursing home applicants. *See* Defendants' Exhibit B. First, a Level I or identification screen determines whether the applicant is mentally ill or retarded. Second, if the first determination is positive, then the patient cannot be admitted until a Level II or preadmission screening determines that it is appropriate for the individual to be in a nursing home and whether active care is required. HFCA is in the process of revising the latest draft and eventually plans to promulgate them as rules. *See* Affidavit of Thomas Hoyer.

The State of Louisiana did its part to implement OBRA. The Secretary of Health and Hospitals of the State of Louisiana wrote to the nursing homes 22 December 1988 to inform them that form 90–L must be completed for all nursing home applicants starting 1 January 1989. *See* Defendants' Exhibit C. The letter goes on to state that form 90–L constitutes the first level of screening and that the Level II screening will be conducted by an independent professional team. The nursing homes, however, are responsible for the Level I screening. *See* Defendants' Exhibit 5. The letter was followed on 20 January 1989 by a rule promulgated without notice or comment under the state's emergency rulemaking authority, La. R.S. § 49:953 B(1). *See* Defendants' Exhibit D. The rule states that HFCA's draft criteria will be utilized in screening nursing home patients. Since HFCA's criteria are subject to change without notice, so is the state regulation. *See* testimony of Bock.

These various attempts to comply with OBRA have sown confusion and hardship. Nursing homes have accepted patients who might not have been properly screened be-

cause the defendants have been very slow in implementing the challenged legislation. *See* testimony of Peach and Rayford. Medicaid payments are made only from the date that the patient is properly screened[1] which means that the nursing home is not paid for the months it sometimes takes to determine whether the patient may be admitted into the nursing home. Warren Bock, who runs the private entity which is conducting the screening for the State of Louisiana, conceded that implementing OBRA has been a "Cecil B. DeMille" production. *See* testimony of Bock. It took months for him to understand HFCA's criteria which he then utilized in implementing the state testing procedure. Bock at 14, 43–44. The resulting program is not only painfully slow but also unclear. Bock conceded that until a week before trial the 90–L forms did not clearly identify whether a patient required a Level II screening. Bock at 15. *See also* the testimony of John Futrell, an employee of the Department of Health and Hospitals, at 24–25 (conceding that there can be honest disputes as to whether a patient needs a Level II screening). The Level II criteria are less than clear as well because they have changed each time that HFCA has changed its draft criteria. Bock at 43–44. The nursing homes, moreover, were kept in the dark about much of the process by which the State of Louisiana attempted to comply with OBRA. Bock at 32–33. It is not surprising, therefore, that the plaintiffs' complain that they do not know the rules of the game.

## II. LAW

### A. *The Standard for Preliminary Injunctions*

In *Canal Authority of the State of Florida v. Callaway*, 489 F.2d 567, 572 (5th Cir.1974), the Fifth Circuit Court of Appeals articulated the test for a preliminary injunction:

(1) a substantial likelihood that plaintiff will prevail on the merits

(2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted

(3) that the threatened injury to plaintiff outweighs the threatened harm the injunction may do to the defendant

(4) that granting the preliminary injunction will not disserve the public interest.

*See also Mississippi Power and Light Co. v. United Gas Pipeline Co.*, 760 F.2d 618, 621 (5th Cir.1985).

The purpose of a preliminary injunction is to "preserve the court's ability to render a meaningful decision on the merits." *Canal Authority*, 489 F.2d at 573. *See also* 7 J. Moore, J.D. Lucas and K. Sinclair, *Moore's Federal Practice*, § 65.04 (2d ed. 1989) and 11 C. Wright and A. Miller, *Federal Practice and Procedure* § 2947 (1973). The preliminary injunction is an extraordinary remedy, however, and the plaintiff must clearly carry the burden of persuasion on each factor. *See Mississippi Power, supra.*

### B. *Irreparable Injury*

The plaintiffs are seeking relief from two kinds of injuries. First, they fear enforcement of various penalty provisions for noncompliance with OBRA. The HFCA can levy civil money penalties, appoint temporary management, and decertify nursing homes. 42 U.S.C. §§ 1396i(b) and 1396r(h)(3). Since HFCA has stated that it will not utilize any penalty provision except decertification until the regulations are finally published, it is clear that only decertification can constitute a threat of irreparable injury. *See* Affidavit of Thomas Hoyer and *American Medical Association v. Bowen*, 857 F.2d 267, 271–72 (5th Cir.1988). Second, the plaintiffs complain that they are not accepting patients for fear of nonpayment and when they do accept a patient, they are not paid until long after he is accepted because the screening process is so slow.

HHS argues that the threat of decertification is not an irreparable injury because no nursing home has been decertified for

---

**1.** 42 U.S.C. § 1396r(e)(7)(D) forbids retroactive    payments.

noncompliance with OBRA. If the plaintiffs had to wait until they were prosecuted in order to obtain a preliminary injunction, then no one could ever enjoin the Government. The plaintiffs would have to wait until they were prosecuted and then use the illegality of the Government's actions as a shield rather than as a sword. A preliminary injunction, however, is a very different remedy than that imagined by HHS. The plaintiffs do not need to wait until it is too late to test the constitutionality of OBRA.

Nor do the plaintiffs have to show with mathematical certainty that HHS will decertify them if they do not comply with its unpublished draft criteria. In *Humana, Inc. v. Avram A. Jacobson*, 804 F.2d 1390, 1394 (5th Cir.1986), the court reasoned "[t]o show irreparable injury if the threatened action is not enjoined, it is not necessary to demonstrate that harm is inevitable and irreparable. The plaintiff need only show a significant threat of injury." *See also Mesa Petroleum Co. v. Cities Service Co.*, 715 F.2d 1425, 1432 (10th Cir.1983) (the fact that the defendants violated an allegedly unconstitutional statute created a significant threat of prosecution). The defendants have made it abundantly clear that the sword of decertification hangs over the plaintiffs' heads. *See* Affidavit of Thomas Hoyer ("Until such time as we have published these final regulations, federal enforcement strategy will chiefly be done through the provider agreement termination authority."); 22 December 1988 letter to nursing home facilities, Defendant's Exhibit C ("YOU MAY NOT ADMIT A PATIENT NEEDING LEVEL II SCREENING TO YOUR NURSING FACILITY.... To do so jeopardizes the certification of the nursing facility."); Defendants' Exhibit 5; testimony of Futrell at 20; and testimony of Rayford.

The other major injury sustained by the plaintiff is monetary. Financial losses are not considered irreparable when they can be calculated because there is an adequate remedy at law. *See Deerfield Medical Center v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir.1981). Courts have, however, granted a preliminary injunction when the injury consists of lost profits because they are impossible to prove with any degree of certainty. *See, e.g., Leaseways, Inc. v. National Truck Leasing Association*, 744 F.2d 588, 591 (7th Cir.1984) (Posner, J.) and *Spiegel v. City of Houston*, 636 F.2d 997, 1001–02 (5th Cir.1981). If the plaintiffs were only complaining about nonpayment for patients who have not undergone a screening, a preliminary injunction would not be proper because damages could be readily calculated. The plaintiffs also complain that they have been forced to turn patients away for fear of nonpayment. Such damages cannot be ascertained and, therefore, they constitute an irreparable injury.

### C. Likelihood of Success on the Merits

#### 1. The Statutory Claims

##### (a) The Administrative Procedure Act

The defendants argue that the plaintiffs' claims under the APA are premature because they failed to exhaust their administrative remedies. The plaintiffs could have petitioned the defendants to conduct rulemaking under 5 U.S.C. § 553(e) and as a general rule exhaustion of administrative remedies is required before suit may be brought. In *Mercy Hospital of Laredo v. Heckler*, 777 F.2d 1028, 1033–1034 (5th Cir. 1985), however, the court noted that exhaustion was not required when (1) the claimant seeks to have the legislative act declared unconstitutional and the administrative remedy would leave the constitutional question standing and when (2) it would be futile to do so because it is clear that the claim would be rejected. Both of these exceptions apply in the instant case. This case presents constitutional issues which agency rulemaking would not settle. Although HHS plans to conduct rulemaking eventually, the agency would have rejected any petition for rulemaking because its position is that it does not have to comply with the APA in order for OBRA to be implemented.

The APA does not require administrative agencies to enact rules. *See Securities and Exchange Commission v. Chenery*, 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995

(1947) and *National Labor Relation Board v. Bell Aerospace Co.*, 416 U.S. 267, 294, 94 S.Ct. 1757, 1771, 40 L.Ed.2d 134, 154 (1974). If the agency has the authority to enact legislative rules [2] and it decides to do so or is required to do so by statute, then it must follow the dictates of the APA. The APA requires that notice of any proposed rulemaking be given in the Federal Register, that opportunity to comment on the proposed rules be given to interested parties, and that the rule be published thirty days prior to its effective date. 5 U.S.C. § 553. Notice, comment, and publication are required only for substantive or legislative rules. Interpretive rules and statements of policy need not comply with these formalities. 5 U.S.C. § 553(b)(A). There is no question that the draft criteria do not meet the procedural requirements of section 553. The question to be decided, therefore, is whether HHS must comply with substantive rulemaking procedures in order to implement OBRA.

The plaintiffs argue that the plain language of OBRA requires HHS to enact substantive rules. 42 U.S.C. § 1396r(f)(8)(A) orders the Secretary to develop minimum criteria for the states to use in determining whether a patient is mentally ill or retarded and criteria are "rules" for the purposes of the APA. HHS ripostes with two main arguments. It denies that the criteria which it must develop are legislative rules subject to the full rigors of the APA and that even if the criteria are rules, OBRA creates an exception to the APA's mandate that an unpublished rule is without legal effect.

### (i) Whether Criteria are Substantive Rules?

42 U.S.C. § 1396r(f)(8)(A) speaks in terms of "criteria" rather than "rules." Criteria are rules. Function, not form, governs the APA. 5 U.S.C. § 551(4) defines rules to mean the "whole or part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agen-

cy." It would be difficult to imagine an agency statement that is not a "rule." *See Batterton v. Marshall*, 648 F.2d 694, 700 (D.C.Cir.1980) ("the breadth of this rule cannot be gainsaid").

Although every agency statement of future effect is a rule, not every "rule" need go through the formalities of notice, comment, and publication. Both policy statements and interpretations are "rules" but they do not require any particular formality in order to be effective. 5 U.S.C. § 553. HHS argues that the draft criteria are either a statement of policy or an interpretation. The label which the agency attaches to its actions is not conclusive, *see Brown Express, Inc. v. United States*, 607 F.2d 695, 700 (5th Cir.1979), and the exceptions to the APA are narrow. *See Baylor University Medical Center v. Heckler*, 758 F.2d 1052, 1058 (5th Cir.1985) and *American Hospital Association v. Bowen*, 834 F.2d 1037, 1044 (D.C.Cir.1987). They are designed to preserve agency flexibility in situations where substantive rights are not at stake. *See Bowen*, 834 F.2d at 1045. The exceptions to the APA, therefore, are premised on the distinction between substantive rules which bind parties and rules which do not have the force of law. In *Batterton*, 648 F.2d at 701–02, the court noted "[l]egislative rules ... grant rights, impose obligations, or produce other significant effects on private interests. [L]egislative rules have substantive legal effect.... Non-binding action, in contrast, merely expresses an agency's interpretation, policy, or internal practice or procedure. Such actions are not determinative of issues or rights addressed." *See also United States Department of Labor v. Kast Metals Corp.*, 744 F.2d 1145, 1152 (5th Cir.1984). The line between substantive and non-substantive rules, however, is a hazy one. *Id.*

The proposed draft criteria are clearly not a statement of policy. A statement of policy merely announces tentative future plans. *See Panhandle Producers & Royalty Owner's Association v. Economic Regulatory Administration*, 847 F.2d

---

**2.** 42 U.S.C. § 1302(a) authorizes HHS to enact rules and regulations.

1168, 1174–75 (5th Cir.1988) and *Bowen,* 834 F.2d at 1046–47. A substantive rule, on the other hand, has the force of law. In *Brown Express, supra,* the court reasoned that a purported policy which was effective immediately could not be a future plan. Since the draft criteria include an "effective" date, it is clear that the agency is telling the public what it will do, not what it might do. The HFCA, moreover, has expressed its clear intent to punish those who do not obey its mandates. *See* Defendants' Exhibit 5. The paradigm of a substantive rule is one which requires obedience on pain of punishment and the draft criteria fit this definition like a glove.

Nor are the draft criteria an interpretive rule. The criteria dealing with the Level I screening might be considered interpretive because the terms "mental illness" and "mental retardation" are to be found in the statute. *Compare Batterton v. Marshall,* 648 F.2d 694 (D.C.Cir.1980) (a rule is not an interpretation when it prescribes the regulatory structure through which a statute is implemented) *with American Postal Workers Union v. United States Postal Service,* 707 F.2d 548 (D.C.Cir.1983) (defining terms found in a statute is an interpretive rule), *cert. denied,* 465 U.S. 1100, 104 S.Ct. 1594, 80 L.Ed.2d 126 (1984). The criteria dealing with the Level II screening, however, are not based on language found within the statute. If Congress leaves gaps in a statute for an agency to fill, then the rules which plug those holes are not interpretations. *See Brown Express, supra.*

The last argument which HHS makes to escape the ambit of APA is that there is no need for the nursing homes to know the regulations. They need only identify the patients who are mentally ill or retarded but they need not identify whether it is appropriate for them to stay.[3] This argument badly misconstrues the purpose of the APA. The Federal Register is not a criminal code. The rulemaking process gives notice by publishing agency regulations. It also introduces "public participation and fairness to affected parties after governmental authority has been delegated to unrepresentative agencies" and ensures that the agency will have before it all the facts it needs in order to properly enact a rule. *See Batterton,* 648 F.2d at 703 and *Bowen,* 834 F.2d at 1044. In short, notice is not equivalent to rulemaking.

#### (ii) Whether OBRA Creates an Exception to the APA?

HHS argues that it is not bound by the rulemaking procedures in the APA because OBRA is an exception to the APA. Although 42 U.S.C. § 1396r(f)(8)(A), which requires HHS to develop the criteria which are to govern the screening of patients, is subject to rulemaking procedures, it must be read in pari materia with 42 U.S.C. § 1396r(e)(7) which requires the states to implement OBRA even if the Secretary fails to develop properly criteria.[4] It is apparent that Congress intended that from 1 January 1989 until the date when HHS finally promulgates rules, OBRA should be enforced. In short, OBRA does create a short-lived exception to the APA.

---

**3.** The sections of OBRA dealing with Level I screening are not as clear as HHS imagines them to be. Mental illness is defined in the statute. *See* 42 U.S.C. § 1396r(e)(7)(G)(i). The draft criteria, however, add limiting language, which is not in the statute, to this definition. *See* Draft Criteria § 4250.1(A)(1), Defendants' Exhibit B. The term mental retardation, on the other hand, is defined only in the proposed regulations. *Compare* 42 U.S.C. § 1396r(e)(7)(G)(ii) *with* Draft Criteria § 4250.1(A)(2). In short, it is false to assert that the plaintiffs could comply with OBRA merely by reading the statute.

**4.** 42 U.S.C. § 1396r(f)(8)(A) states:

[The] Secretary shall develop, by not later than October 1, 1988, minimum criteria for States to use in making determinations under subsections (b)(3)(F) and (e)(7)(B).
42 U.S.C. § 1396r(e)(7) states:
Effective January 1, 1989, the State must have in effect a preadmission screening program, for making determinations (using any criteria developed under (f)(8)) described in section (b)(3)(F) ... who are admitted to nursing facilities on or after January 1, 1989. The failure of the Secretary to develop minimum criteria under subsection (f)(8) shall not relieve any State of its responsibility to have a preadmission screening program.

OBRA does not tell us, however, which penalties should attach to noncompliance with the unpublished draft criteria. " 'The difficulties,' " wrote Judge Learned Hand, " 'of so-called interpretation arise when the legislature has no meaning at all; when the question which is raised in the statute never occurred to it; when what the judges have to do is, not what the legislature did mean on a point that was not present to its mind, but to guess what it would have intend on a point to its mind, have the point been present.' " L. Hand, *The Bill of Rights* 18 (1986) (quoting J. Gray, *Nature and Sources of Law*).

The one "penalty" which HHS is certainly entitled to exact is nonpayment. In *Texas Health Care Association v. Bowen*, 710 F.Supp. 1109 (W.D.Tex.1989) the court reasoned that during the interim period from 1 January 1989 until HHS finally publishes the criteria Congress did not intend that patients would be denied nursing home care. *Id.* at 1113. The court held that HHS had to pay the nursing homes regardless of whether they complied with OBRA in order to ensure patients proper care during this interim period. This court agrees with the *Texas Health Care* court that noncompliance by HHS with the APA is wreaking hardship on patients and nursing homes. The old system has been changed but there is not yet a new one to take its place. Nevertheless, this court cannot agree that HHS must pay noncomplying nursing homes. If HHS were forced to pay the nursing homes that did not comply with OBRA simply because no regulations were in force, then the language of the statute requiring OBRA to go into effect by 1 January 1989 would be rendered nugatory. The clear language of a statute cannot be ignored in order to effectuate its intent.

This court holds, however, that there are no other penalties, such as decertification, which HHS may utilize during this interim period. In *Idaho Health Care Association v. Sullivan*, 716 F.Supp. 464 (D. Idaho 1989) the district court reasoned that OBRA carved out a complete exception to the APA and that, therefore, HHS could not be enjoined from enforcing its mandates. *Id.* at 471. This court disagrees with the conclusions reached by the *Idaho Health Care Association* court because the APA contains explicit language governing its partial repeal by future statutes.

The APA states that a "[s]ubsequent statute may not be held to supersede or modify this subchapter ... except to the extent that it does so expressly." 5 U.S.C. § 559. *See Marcello v. Bonds*, 349 U.S. 302, 310, 75 S.Ct. 757, 761, 99 L.Ed. 1107, 1116 (1955) ("Exemptions from the terms of the Administrative Procedure Act are not lightly to be presumed."); *Brownell v. Tom We Shung*, 352 U.S. 180, 185, 77 S.Ct. 252, 255, 1 L.Ed.2d 225, 229–30 (1956); and *Director, Office of Workmen's Compensation Program, United States Department of Labor v. Alabama By–Products Corp.*, 560 F.2d 710, 719–20 (5th Cir.1977). Justice Jackson in *Wong Yang Sung v. McGrath*, 339 U.S. 33, 40–41, 70 S.Ct. 445, 449–50, 94 L.Ed. 616, 624 (1950), noted that administrative agencies should be required to conform to the APA as much as possible:

> The Act ... represents a long period of study and strife; it settles long-continued and hard-fought contentions, and enacts a formula upon which opposing social and political forces have come to rest. It contains many compromises and generalities and, no doubt, some ambiguities. Experience may reveal defects. But it would be a disservice to our form of government and to the administrative process itself if the courts should fail, so far as the terms of the Act warrant, to give effect to its remedial purposes where the evils it was aimed at appear.

In short, OBRA creates an exception to the APA only insofar as is needed to ensure that the screening process is in place by 1 January 1989. To give it any greater effect would frustrate the policy goals of the APA. It is imperative that HHS be not required to pay noncomplying nursing homes because otherwise the program could not be carried in a timely fashion. It is not imperative that HHS be authorized to penalize the nursing homes because the

decertification procedures are not needed in order to put the program into place. By forbidding HHS to decertify the nursing homes, moreover, pressure is put on the agency to comply eventually with the APA.

(b) *The Louisiana Administrative Procedure Act*

Neither party raised any doubts as to this court's subject matter jurisdiction to hear the claims based on the Louisiana Administrative Procedure Act. In *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 121, 104 S.Ct. 900, 919, 79 L.Ed.2d 67, 92 (1984) the court held that a claim that a state official has violated a state law runs afoul of the eleventh amendment. Although lack of subject matter jurisdiction is normally not a waivable defect, sovereign immunity is a personal privilege and the voluntary appearance of a state in federal court can be deemed a waiver. *See Clark v. Barnard*, 108 U.S. 436, 447–48, 2 S.Ct. 878, 882–83, 27 L.Ed. 780, 784–85 (1883). The State of Louisiana is of course free to raise the shield of the eleventh amendment later in this litigation, *see Ford Motor Co. v. Department of Treasury of the State of Indiana*, 323 U.S. 459, 466–67, 65 S.Ct. 347, 351–52, 89 L.Ed. 389, 395–96 (1945), but insofar as this preliminary injunction is concerned Louisiana has waived its sovereign immunity. *See also Edelman v. Jordan*, 415 U.S. 651, 677–81, 94 S.Ct. 1347, 1362–64, 39 L.Ed. 2d 662, 681 (1974) and *Patsy v. Florida Board of Regents*, 457 U.S. 496, 515 n. 19, 102 S.Ct. 2557, 2567 n. 19, 73 L.Ed.2d 172 (1982).

It is clear, however, that there is no violation of the Louisiana Administrative Procedure Act, La. R.S. § 49:953 B(1) authorizes the state to publish rules without giving notice "to the extent necessary to avoid sanctions or penalties from the United States." On 30 December 1988 HFCA warned the state medicaid director that if the prescreening requirements "are not being met ..., HFCA will pursue compliance actions against the state.... The compliance proceedings may result in the loss of all Federal financial participation in your State's Medicaid nursing home." *See* Defendants' Exhibit 4. *See also* testimony of Futrell at 14–15. In response to this ultimatum, the State enacted an emergency rule. *See* Defendants' Exhibit 1. The rule simply states that the Department of Health and Hospitals will comply with HFCA's draft criteria. The rule is as clear as could be expected since Louisiana is bound to follow HFCA's directive in conducting preadmission screenings and the criteria are subject to change without notice.

2. The Constitutional Claims

The plaintiffs claim that OBRA violates their right to liberty of contract is without foundation. Freedom of contract is limited by the authority of the state to effectuate a legitimate objective. *See Lochner v. New York*, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905) (Holmes, J., dissenting) ("I think that the word 'liberty,' in the 14th Amendment, is perverted when it is held to prevent the natural outcome of a dominant opinion, unless it can be said that a rational and fair man necessarily would admit that the statute proposed would infringe fundamental principles as they have been understood by the traditions of our people and our law."). It is too late in the day to attack legislation which is rationally related to a permissible purpose. *See Ferguson v. Skrupa*, 372 U.S. 726, 83 S.Ct. 1028, 10 L.Ed.2d 93 (1963) (Black, J.) ("We have returned to the original constitutional proposition that courts do not substitute their social and economic beliefs for the judgment of legislative bodies who are elected to pass laws.").

The plaintiffs' claim that OBRA impermissibly impairs their contractual obligations is a more substantial argument than the one premised on liberty of contract. There are two types of contracts which OBRA potentially impairs: the contracts between patients and nursing homes and the provider agreements between the nursing homes and the Government.

The parties assumed that the contract clause which prohibits the states from impairing contractual obligations applies to the United States by virtue of the fifth

amendment's due process clause. In *Pension Benefit Guaranty Corp. v. R.A. Gray Co.*, 467 U.S. 717, 733, 104 S.Ct. 2709, 2719, 81 L.Ed.2d 601, 613 (1984), the Supreme Court reasoned that the federal government is not restricted in the same fashion as the states are from impairing contracts between private individuals because the protection afforded by the fifth amendment's due process clause is "less searching than [that] mandated by the contract clause." The Court eschewed a heightened form of scrutiny:

> Provided that the retroactive application of a statute is supported by a legitimate legislative purpose furthered by rational means, judgments about the wisdom of such legislation remains within the exclusive province of the legislative and executive branches.

467 U.S. at 729, 104 S.Ct. at 2717–18. There can be no doubt that Congress could decide that mentally ill and retarded patients were being inappropriately placed in nursing homes. It would be hard to imagine a more rational means of putting a stop to this than to prevent such individuals from entering nursing homes unless a determination is made that it would be appropriate.

The provider agreements, however, may demand a different form of scrutiny than the contracts between patients and nursing homes. In *National Railroad Passenger Corp. v. Atchison, Topeka and Santa Fe Railway Co.*, 470 U.S. 451, 471, 105 S.Ct. 1441, 1454, 84 L.Ed.2d 432, 449 (1985) the Court noted that if the federal government were to impair its own contractual obligations, then a more rigorous standard of review might be applied than the rational basis test. The plaintiffs, though, did not introduce the provider agreements into evidence and the defendants deny that they are contracts. Without additional evidence, this court cannot render a decision of this issue.[5]

### D. The Balance of Injuries

The defendants will suffer no injury because they are free to implement OBRA. The defendants will actually be helped if they are precluded from penalizing the plaintiffs. The result of this court's ruling is that HHS will eventually have to follow the mandate of section 553. Since the APA rulemaking procedures inject an element of democracy into the agency process, the agency will end up with a better and fairer set of rules than it would have had had it not gone through this process. The plaintiffs, on the other hand, would suffer injury if HHS were allowed to penalize them before rules are enacted. No one should be forced to comply with rules that are not yet in force and which cannot be known because they are subject to change. Their voice, moreover, should be heard before any rules are enacted.

### E. The Public Interest

Congress determined that a "[s]ubstantial numbers of mentally retarded and mentally ill residents are inappropriately placed, at Medicaid expense, in [nursing homes]. These residents often do not receive the active treatment or services that they need." H.R.Rep. No. 391(1), 100th Cong., 1st Sess. 459 (1987), *reprinted in* 1987 U.S.Code Cong. & Admin.News 2313–1 to 2313–279. In order to prevent this, Congress required HHS to develop criteria and the states to implement OBRA by 1 January 1989. This court's ruling will further both of these aims. If the criteria were not binding, then the states would be free to do what they wished in order to implement OBRA. This is contrary to Congress' desires and, therefore, it is in the public interest to hold that the proposed criteria are substantive rules. It is equally important that this program be in place by 1 January 1989 and, therefore, this court holds that HHS need not pay noncomplying nursing homes.

It is in the public interest, moreover, to require HHS to follow rulemaking procedures before it may penalize any nursing

---

**5.** The contracts between patients and nursing homes were also not introduced into evidence but since no one denies that such contracts exist, the merits of the plaintiffs' constitutional arguments could be reached.

homes. Proper rulemaking ensures adequate notice and democratic participation. The APA "represents a long period of study and strife ... and enacts a formula upon which opposing social and political forces have come to rest. [I]t would be a disservice to our form of government ... if the courts should fail ... to give effect to its remedial purpose." *Wong Yang Sung,* 339 U.S. at 40–41, 70 S.Ct. at 450.

### F. *Conclusion*

HHS would like to have its cake and eat it too. It wants the states to follow its draft criteria but argues that they should not be made binding because it needs the flexibility to develop and refine them further. It is precisely this sort of argument which the APA rejects. Rules which bind parties are substantive regardless of whether they are the "final" version or not. It is doublespeak to argue that the criteria are a "draft" and, therefore, not substantive when HHS is also seeking to enforce the criteria.

Although the draft criteria are substantive rules and HHS has failed to comply with the APA, it is clear that OBRA creates a partial and short-lived exception to the APA. HHS does not need to pay the nursing homes for those patients who are not properly screened because to hold otherwise would frustrate Congress' intent that the program be in place by 1 January 1989. HHS, however, may not otherwise penalize any nursing home until it finally promulgates rules. If HHS were given a free pass to derogate from the APA, it would have no incentive to comply with proper rulemaking procedures which would frustrate Congress' intent to have criteria, that is rules with the force of law, govern preadmission screening.